### KIRL v. ZINNER.

1. RELEASE—CONSIDERATION.

Release of claim by seriously injured indigent man in return for payment of hospital and doctor bills *held*, not obtained as result of fraud, mistake, duress or because of unconscionable advantage taken where adjuster visited hospital five weeks after accident at request of doctor who was desirous of having hospital and himself paid for services rendered.

2. SAME—CONTRACT.

In the law of contract, equivalents are exchanged but the very essence of a release is to avoid litigation, even at the expense of strict right.

3. SAME—REPUDIATION—STATUS QUO—PAYMENT.

One repudiating or seeking to avoid a compromise settlement or release, and thereby revert to the original right of action, must place the other party *in statu quo*, else payment made in consideration of release might operate as a confession of liability.

4. SAME—IMPEACHMENT.

In action to recover for serious injuries sustained by indigent man, his failure to recall having signed release and indorsing checks sufficient to pay hospital and doctor bills *held*, insufficient to impeach release.

5. Compromise and Settlement—Restoration of Status Quo.
   Rule that one seeking to set aside a compromise even on ground
   of fraud, duress or mistake must place other party *in statu
   quo* or else be bound by the settlement, applies to actions
   *ex contractu* as well as *ex delicto*.

6. Same—Presumptions—Burden of Proof.
   A settlement being once shown, every presumption is indulged in
   favor of its fairness and correctness and burden of proving
   basis for avoidance thereof is on party seeking such avoidance.

7. Appeal and Error—Wrong Reason for Right Result.
   Right result prevails on appeal although trial court may have
   given wrong reason for his holding, where right reason was
   also presented.

Bushnell and Potter, JJ., dissenting.

Appeal from Macomb; Reid (Neil E.), J. Submitted October 16, 1935. (Docket No. 88, Calendar No. 38,485.) Decided January 7, 1936. Rehearing denied January 31, 1936.

Case by Alex Kirl against Edith Zinner for personal injuries sustained when struck by an automobile on a highway. Verdict for plaintiff. Judgment for defendant *non obstante veredicto*. Plaintiff appeals. Affirmed.

*George W.* and *Clifford A. John,* for plaintiff.

*Bert V. Nunneley, Howard D. Brown* (*Robert G. Jamieson,* of counsel), for defendant.

Wiest, J. I do not join in the opinion of Mr. Justice Potter, nor in the criticism of Dr. Norton, for I think the opinion relative to the release erroneous, and the criticism unwarranted.

Plaintiff was indigent, and the hospital was not a public institution, nor was the doctor in the em-

ploy of the public. The one opened its doors to the injured man, and the other rendered him medical and surgical services. Both were justly concerned about their pay for the services, and plaintiff evidently wanted them paid. It is true that when he entered the hospital he was then, and for a time, obstreperous, but such was not by reason of his fractured leg.

The physician, attending plaintiff at the hospital, testified:

"During the night he got out of bed on his splint and was so obstreperous we had to put him in a restraining sheet, and of course he had to have some medicine to help quiet him. * * * We had to keep him in a restraining sheet for about a week, kept his hands tied so he would not tear the bandages off and get out of bed.

"*Q.* Was there anything else the matter with him besides the broken leg and this cut, doctor?

"*A.* Well, just that he was poisoned with bad liquor.

"*Q.* What makes you say that, doctor?

"*A.* Well, he had—he was just plain drunk, crazy drunk, in a way that good liquor would not make him, and he had an upset stomach, and he was vomiting, and his kidneys showed a marked irritation. There were, if I remember, rightly, three-plus albuminuria present, which it took about two weeks to clear up perfectly eventually. So I am satisfied it was some poison that he had been taking which brought it about. * * * In the ordinary case of broken leg the patient is not out of his head. This patient was more or less out of his head for a time after he came to the hospital there.

"*Q.* As far as you can remember, about how long would you say that was?

"*A.* Well, it was—well, he was very obstreperous and noncooperative for a week afterwards. He

was perhaps—you couldn't call him unconscious for more than, I think, 36 or 48 hours.''

At the time of the settlement, about five weeks after the accident, plaintiff was up and about on crutches. It is also true that the release was not read to him, but the reason was that it was handed to him and he read it, and stated that he also wanted an automobile. He disposes of the settlement and release by saying that he has no memory on the subject.

If that disposes of the matter a safe retreat is open to parties to a settlement, for it shows an easy way to avoid a release.

At the time of signing the release plaintiff's mental faculties were functioning, for he requested an automobile in addition to the payment of the doctor and hospital. This he did not deny and, of course, could not deny under his claim of no memory on the subject.

I cannot take the uncontradicted testimony relative to the release and, upon plaintiff's claim of lack of memory on the subject, find evidence of fraud, mistake, duress, or unconscionable advantage taken.

Of course, the doctor wanted his pay, as did the hospital, and it is no unkindness to plaintiff to find that he wanted to see them paid and accepted the only method open to him to accomplish that purpose.

A compromise and release is not to be confused with the law of contract, in which equivalents are exchanged, for the very essence of a release is to avoid litigation, even at the expense of strict right.

Here was no confession of liability but an unliquidated claim for an alleged tort, asserted by one party and denied by the other.

The case at bar is not an instance of an insurance adjuster rushing to the hospital and inducing a sufferer in agony to release a tortfeasor. The adjuster was requested to visit the hospital by the doctor attending plaintiff.

It is a general and salutary rule that one repudiating or seeking to avoid a compromise settlement or release, and thereby revert to the original right of action, must place the other party *in statu quo,* otherwise the very fact of payment, in consideration of the compromise or release, will likely operate as a confession of liability.

When it appeared that plaintiff signed the release and indorsed the checks for the stipulated amount thereof, and his only reply thereto was that he had no memory of doing so, there was no impeachment of the release, and it was effective, and judgment should have been directed for defendant.

"Where a party to a compromise desires to set aside or avoid the same and to be remitted to his original rights, he must place the other party *in statu quo* by returning or tendering the return of whatever has been received by him under such compromise, in case it is of any value, and so far as possible any right lost by the other party because thereof. This rule obtains even though the contract was induced by the fraud or false representations of the other party, or was obtained under duress, or was made under a mistake of fact or as to the law; and until this is done the settlement will constitute a good defense. By electing to retain the property, a party must be held to be bound by the settlement. The rule applies to actions *ex contractu* as well as *ex delicto.*" 12 C. J. p. 355, § 57.

"A settlement being once shown every presumption is indulged in favor of its fairness and correct-

ness; and the burden of proving mistake, fraud, duress, or other facts relied on in avoidance of a compromise and settlement is on the party seeking to avoid the settlement.'' 12 C. J. p. 365, § 79.

By bringing suit plaintiff forced defendant to plead the release and then, if successful, disposed of it by saying he had no memory on the subject.

The circuit judge may have given a wrong reason for a right result, but the right reason was also presented, and if the result is right it must prevail.

The judgment is affirmed, with costs to defendant.

NORTH, C. J., and FEAD, BUTZEL, and EDWARD M. SHARPE, JJ., concurred with WIEST, J.

POTTER, J. (*dissenting*). Plaintiff, a young man 33 years of age, was, December 14, 1932, injured by being struck by an automobile driven upon the public highway by defendant, brought suit to recover damages for the injuries suffered, had verdict at the hands of a jury for $950, which verdict was set aside by the trial court and judgment entered, notwithstanding the verdict, for defendant. Plaintiff brings the case here by appeal in the nature of writ of error.

The principal question as here presented is whether there was any evidence to go to the jury to sustain the verdict rendered by it. In order for plaintiff to recover, it was incumbent upon him to prove by a preponderance of the evidence that defendant was guilty of negligence which was the proximate cause of his injury; that he was free from negligence causing or contributing to the injury received by him; and that the settlement claimed to have been entered into by plaintiff did not constitute a bar to his recovery.

Appellant says that contributory negligence was not established and that the trial court should have

granted a new trial to plaintiff on the ground of the inadequacy of the damages fixed by the jury. Defendant claims plaintiff was drunk and was guilty of contributory negligence as a matter of law. There was proof introduced to sustain this contention, but plaintiff testifies directly and positively that he was not drunk and had not drunk any liquor that day; that although he had two empty bottles in his overcoat pocket, he had picked up these bottles to take home because he was in the habit of so doing, selling the bottles for his own use and benefit. There was other testimony tending to corroborate his claim. The question of whether plaintiff was drunk or not was for the jury. The trial court found the preponderance of evidence was in favor of plaintiff's intoxication, but recognized that he was bound to accept plaintiff's testimony as true for the purposes of the motion. The trial court placed plaintiff's contributory negligence as a matter of law upon his failure to note the lights of defendant's automobile coming from behind him. The court said:

"He was required to note the lights of Mrs. Zinner's car approaching, which would throw their rays on the pathway ahead of him. His own sworn testimony, undisputed in the case, that he did not observe these lights, clearly shows his contributory negligence."

Plaintiff testified that he was walking on the right-hand side of the pavement within one or two feet of the outer edge and that he heard no horn sounded by defendant's car, nor was his attention attracted by the lights therefrom. It is not indicated by the trial court what plaintiff should have done had he known defendant's car was coming from behind.

Defendant had no right to drive her automobile upon the public highway at the place and at the time in question at a speed greater than would permit her to bring it to a stop within the assured clear distance ahead (1 Comp. Laws 1929, § 4697, as amended by Act No. 119, Pub. Acts 1933); and it was *prima facie* unlawful for her to exceed that limitation in speed (1 Comp. Laws 1929, § 4697, as amended by Act No. 119, Pub. Acts 1933). She was required by statute to have her car equipped with headlights (1 Comp. Laws 1929, § 4736, as amended by Act No. 64, Pub. Acts 1931) that would at all times, under normal atmospheric conditions, on a level road, produce a light sufficient to render clearly discernible a person 200 feet ahead (1 Comp. Laws 1929, § 4738, as amended by Act No. 59, Pub. Acts 1931), and she was required to have her automobile equipped with brakes that would stop her car on a dry pavement within 40 feet at 20 miles an hour (1 Comp. Laws 1929, § 4731). It is very clear that if defendant was driving her car at a rate of speed so she could not bring it to a stop, she was guilty of negligence as a matter of law; and, under the facts in this case, whether or not she was guilty of negligence was a question of fact for the jury.

There is no statute which says a person shall walk on any particular portion of a public highway which is open for the use of all the people without distinction for passage and repassage at their pleasure. A pedestrian may walk on any part of a public highway, and persons operating automobiles must use reasonable and ordinary care not to run down pedestrians upon such highways. A pedestrian has a right to rely upon the presumption the driver of an automobile will exercise due care and is not, as a matter of law, required to look back for approaching vehicles. *Wiel* v. *Wright,* 55 Hun, 611 (8 N. Y.

Supp. 776); *Adolph* v. *Railroad Co.,* 76 N. Y. 530; *Church* v. *Spicer,* 85 Conn. 579 (83 Atl. 1115); *Stringer* v. *Frost,* 116 Ind. 477 (19 N. E. 331, 2 L. R. A. 614, 9 Am. St. Rep. 875); *Shapleigh* v. *Wyman,* 134 Mass. 118; *Williams* v. *Grealy,* 112 Mass. 79; *Moebus* v. *Herrmann,* 108 N. Y. 349 (15 N. E. 415, 2 Am. St. Rep. 440); *Raymond* v. *Hill,* 168 Cal. 473 (143 Pac. 743); *Petrie* v. *E. A. Myers Co.,* 269 Pa. 134 (112 Atl. 240); *Hennessey* v. *Taylor,* 189 Mass. 583 (76 N. E. 224, 3 L. R. A. [N. S.] 345, 4 Ann. Cas. 396); *People* v. *Blandford,* 23 Porto Rico, 580; *Graham* v. *Evening Press Co.,* 135 Mich. 298; *Tio* v. *Molter,* 262 Mich. 655.

In *Wiel* v. *Wright, supra,* a charge that it was the duty of the plaintiff to look in all directions, whether before or behind, was held properly refused.

In *Adolph* v. *Railroad Co., supra,* it was said:

"Each individual of the entire public, as a general rule and in the absence of especial regulation by law, has as good right to be upon the common street or highway as any other individual thereof. *   *   * Hence, he is not bound to look back, or to listen for the coming of another, so as to make clear the way before him."

In *Petrie* v. *E. A. Myers Co., supra,* the court said:

"It seems to us that, as decedent was lawfully upon the highway, using the extreme right-hand paved roadway, he could safely assume, as his rights were equal with those of the users of motor or horse-driven vehicles, that he would not be struck from the rear by any such vehicles."

In *Church* v. *Spicer, supra,* a charge by the trial court that, "one is not obliged, as a matter of law, under ordinary circumstances, to look back and see whether he is in danger of being run into by teams going in the same direction that he is traveling; but

it is for you to consider whether, as a matter of fact, under the circumstances of this case, a man in his senses ought not to look back and see whether he is about to be run into by a team traveling in the same direction on the highway. This is not a question of law; it is a question of fact for you to decide,'' was approved.

In *Raymond* v. *Hill, supra,* an instruction that pedestrians have in general, and under reasonable restrictions as to the exercise of care by them, a right to travel anywhere upon a public highway, and that it is negligence for a driver of a vehicle upon the public highway to recklessly run upon a pedestrian who is standing or walking with his back toward him was said to state an unimpeachable proposition of law.

No statute required plaintiff to walk upon any part of the pavement and he had a legal right to walk on any part thereof, exercising, however, the care of a reasonably prudent man for his own protection and preservation. *Korstange* v. *Kroeze,* 261 Mich. 298.

Pedestrians in a public highway have a right to assume that the driver of an automobile will use ordinary care for their protection, but they must at the same time take reasonable care for their own safety. *Warwick* v. *Blackney,* 272 Mich. 231.

''We are cited to no case, and know of none, which casts upon a pedestrian traveling the street the duty of keeping a constant lookout to the rear as matter of law. The question of what constitutes due care in such a case is for the jury.'' *Graham* v. *Evening Press Co., supra.*

''If struck by an auto coming behind him, his negligence presents a jury question.'' *Tio* v. *Molter, supra.*

The testimony of the plaintiff in this case was that he was going home on the night in question, which was dark, walking on the right-hand side of the pavement within one or two feet of the outer edge thereof, when he was struck by defendant's automobile. Under the circumstances, the question whether he was guilty of contributory negligence was a question of fact for the determination of the jury.

It is said by counsel for defendant judgment should be affirmed because of the written release of claim signed by plaintiff. Plaintiff's counsel claim the question of whether this receipt or release of claim is binding upon plaintiff is a question of fact for the jury under the circumstances.

This release of claim is dated January 20, 1933, the day before the plaintiff was taken to the county infirmary from the hospital. It may be admitted plaintiff signed this release of claim. Plaintiff says the doctor told him this was the bill of the hospital, and plaintiff knew he had settled with the hospital and the doctor. The adjuster of the insurance company stated that he denied any liability upon the part of the insurance company for plaintiff's injury, but that the doctor was anxious to get the hospital's money and his own. The insurance company decided to take care of the medical bill and the hospital bill. The doctor testifies he told plaintiff the insurance company would settle the hospital bill and his bill up to that time, providing he was willing to sign releases.

"*Q.* Then you communicated to Stuart. You told him that so far as you and the hospital were concerned that was O. K.?

"*A.* I called him up and told him that Mr. Kirl had agreed to their arrangement.

"*Q.* But Mr. Kirl had not agreed with him at that time, had he?

"*A.* No.

"*Q.* And you were not undertaking to make any agreement with Alex Kirl that would prevent him getting compensation, as you mentioned a little while ago, for his injuries?

"*A.* So far as I know he had never been to see Alex at all, until I told him."

As soon as this was communicated to Mr. Stuart, of the insurance company, he caused to be prepared the releases, obtaining the amounts to be inserted therein from the hospital records and the doctor, and, although the insurance company claimed there was no liability upon its part, went to the hospital and visited Mr. Kirl, and he says:

"*A.* It was perfect good faith with me. I had no idea of beating him. I was told he wanted the amount of his bills and I took care of him. I assumed that from the doctor and he told the doctor that.

"*Q.* And the doctor told you. But you were working for the automobile club and anxious to get this case out of the way just as cheap as you could?

"*A.* It was not necessary—

"*Q.* I say, is that the fact?

"*A.* No, it is not the fact."

But he further testified as to his conversation with the doctor:

"*A.* He told me that he had spoken to Mr. Kirl. Mr. Kirl—all he was interested in was the actual bills."

It is a fair inference from the testimony that the hospital and the doctor wanted their bills paid and the insurance company saw an opportunity to obtain

a release from Kirl under his then condition. The doctor admits he had no agreement with Kirl that he was to release the personal liability of defendant or to release the insurance company, that he misrepresented the situation to the insurance company, and we think it is a fair inference from the testimony the insurance company stated to Kirl at the time it obtained the receipt and release that he was signing these papers in order to permit the doctor and the hospital to have their bills paid. The doctor advised that he was interested, first, in getting the hospital's money because of their interest in it and at their suggestion, and, secondly, to get his own pay; that any settlement they made with plaintiff was up to the insurance company so far as the doctor was concerned; and he told Kirl the insurance company was willing to pay the hospital bill and the doctor's bill up to that time if he was willing to sign releases. Anyway, Stuart, representing the insurance company, went to Kirl and obtained his signature. He did not read over the releases to Mr. Kirl, he did not tell him the amounts contained therein. He told him this was a release for the doctor's bill and the hospital bill. Stuart says he and the doctor had a thorough understanding. But no one claims there was any understanding on the part of plaintiff or that he knew when he signed this instrument he was releasing defendant from liability.

Plaintiff was severely injured. He suffered from concussion of the brain. He was unconscious for a period of about nine days, at least irrational, obstreperous and noncooperative. The injury affected his eyesight. He was an uneducated workingman, although he could read and write. But he testified he did not read the instrument, that his eyesight was

such that he could not read, and the testimony shows in addition he was hard of hearing and did not understand he was signing an instrument releasing defendant from liability.

We think there was testimony plaintiff never understandingly or intelligently signed any paper which constituted a release of defendant from liability, and that there was testimony to go to the jury to sustain its finding that this release was procured from a man who was in no mental condition to know its contents, who was unable to read its contents, who was not told he was releasing the liability of defendant but whose signature was procured to an instrument which he did not read and whose contents he did not know, without disclosing to him he was releasing defendant from liability by that instrument and by stating to him he was providing only for the payment of the doctor and the hospital which it is admitted were the only amounts covered by the release. When to this we add that the doctor and the hospital were anxious to get their pay and the doctor misrepresented the facts to the insurance company, it may be the insurance adjuster did not knowingly participate in the fraud, but the result to the plaintiff is the same whether he did so intentionally or not. We think this question was for the jury.

We are constrained to reverse the judgment of the trial court and direct that judgment should be entered upon the verdict, with costs.

BUSHNELL, J., concurred with POTTER, J.

The late Justice NELSON SHARPE took no part in this decision.